(ii)    (A)    Subject to Section 6(b)(v), prepare and file with the SEC such amendments, including post-effective amendments, to each Registration Statement and the Prospectus used in connection therewith as may be necessary to keep the Registration Statement continuously effective, as to the applicable Registrable Securities for the Effectiveness Period and prepare and file with the SEC such additional Registration Statements in order to register for resale under the Securities Act all of the Registrable Securities; (ii) cause the related Prospectus to be amended or supplemented by any required Prospectus supplement, and as so supplemented or amended to be filed pursuant to Rule 424; (iii) respond as promptly as reasonably possible, and in any event within 12 Trading Days (except to the extent that the Company reasonably requires additional time to respond to accounting comments), to any comments received from the SEC with respect to the Registration Statement or any amendment thereto and as promptly as reasonably possible provide to Buyers, upon request, true and complete copies of all correspondence from and to the SEC relating to the Registration Statement; and (iv) comply in all material respects with the provisions of the Securities Act and the Exchange Act with respect to the disposition of all Registrable Securities covered by the Registration Statement during the applicable period in accordance with the intended methods of disposition by the Buyers thereof set forth in the Registration Statement as so amended or in such Prospectus as so supplemented.

(B)    Notify the Buyers as promptly as reasonably possible of any of the following events: (i) the SEC notifies the Company whether there will be a "review" of any Registration Statement; (ii) the SEC comments in writing on any Registration Statement; (iii) any Registration Statement or any post-effective amendment is declared effective; (iv) the SEC or any other Federal or state governmental authority requests any amendment or supplement to any Registration Statement or Prospectus or requests additional information related thereto; (v) the SEC issues any stop order suspending the effectiveness of any Registration Statement or initiates any action, claim, suit, investigation or proceeding (including, without limitation, an investigation or partial proceeding, such as a deposition), whether commenced or threatened in writing (a "**Proceeding**") for that purpose; (vi) the Company receives notice of any suspension of the qualification or exemption from qualification of any Registrable Securities for sale in any jurisdiction, or the initiation or threat of any Proceeding for such purpose; or (vii) the financial statements included in any Registration

Statement become ineligible for inclusion therein or any statement made in any Registration Statement or Prospectus or any document incorporated or deemed to be incorporated therein by reference is untrue in any material respect or any revision to a Registration Statement, Prospectus or other document is required so that it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(C)     Use its reasonable best efforts to avoid the issuance of or, if issued, obtain the withdrawal of (i) any order suspending the effectiveness of any Registration Statement, or (ii) any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction, as soon as possible.

(D)     If requested by a Buyer, provide such Buyer, without charge, at least one conformed copy of each Registration Statement and each amendment thereto, including financial statements and schedules, and all exhibits to the extent requested by such Person (including those previously furnished or incorporated by reference) promptly after the filing of such documents with the SEC.

(E)     Promptly deliver to each Buyer, without charge, as many copies of the Prospectus or Prospectuses (including each form of prospectus) and each amendment or supplement thereto as such Persons may reasonably request. The Company hereby consents to the use of such Prospectus and each amendment or supplement thereto by each of the selling

Buyers in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto to the extent permitted by federal and state securities laws and regulations.

(F)     .     (i) In the time and manner required by each Principal Market, prepare and file with such Principal Market an additional shares listing application covering all of the Registrable Securities; (ii) take all steps necessary to cause such Registrable Securities to be approved for listing on each Principal Market as soon as possible thereafter; (iii) provide to Buyers, upon request, evidence of such listing; and (iv) except as a result of the Excluded Events, during the Effectiveness Period, maintain the listing of such Registrable Securities on each such Principal Market or another Eligible Market.

(G)     Prior to any public offering of Registrable Securities, use its reasonable best efforts to register or qualify or cooperate with the selling in connection with the registration or qualification (or exemption from such registration or qualification) of such Registrable Securities for offer and sale under the securities or Blue Sky laws of such jurisdictions within the United States as any Buyer requests in writing, to keep each such registration or qualification (or exemption therefrom) effective for so long as required, but not to exceed the duration of the Effectiveness Period, and to do any and all other acts or things reasonably necessary or advisable to enable the disposition in such jurisdictions of the Registrable Securities covered by a Registration Statement; provided, however, that the Company shall not be obligated to file any general consent to service of process or to qualify as a foreign corporation or

as a dealer in securities in any jurisdiction in which it is not so qualified or to subject itself to taxation in respect of doing business in any jurisdiction in which it is not otherwise so subject.

(H)     Cooperate with the Buyers to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be delivered to a transferee pursuant to a Registration Statement, which certificates shall be free, to the extent permitted by this Agreement and under law, of all restrictive legends, and to enable such Registrable Securities to be in such denominations and registered in such names as any such Buyers may reasonably request.

(I)     Upon the occurrence of any event described in <u>Section 6(c)(ii)(B)(iv)</u>, as promptly as reasonably possible, prepare a supplement or amendment, including a post-effective amendment, to the Registration Statement or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference, and file any other required document so that, as thereafter delivered, neither the Registration Statement nor such Prospectus will contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(J)     Cooperate with any reasonable due diligence investigation undertaken by the Buyers in connection with the sale of Registrable Securities, including, without limitation, by making available documents and information; provided that the Company will not deliver or make available to any Buyer material, nonpublic information unless such

|  | Buyer specifically requests in advance to receive material, nonpublic information in writing. |
|---|---|
| (K) | Comply with all rules and regulations of the SEC applicable to the registration of the Securities. |

(a) <u>Registration Expenses</u>.  The Company shall pay all fees and expenses incident to the performance of or compliance with Section 6 of this Agreement by the Company, including without limitation (i) all registration and filing fees and expenses, including without limitation those related to filings with the SEC, any Principal Market and in connection with applicable state securities or Blue Sky laws, (ii) printing expenses (including without limitation expenses of printing certificates for Registrable Securities), (iii) messenger, telephone and delivery expenses, (iv) fees and disbursements of counsel for the Company, (v) fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement, and (vi) all listing fees to be paid by the Company to the Principal Market.

(b) <u>Indemnification</u>

(i)    <u>Indemnification by the Company</u>.  The Company shall, notwithstanding any termination of this Agreement, indemnify and hold harmless each Buyer, the officers, directors, partners, members, agents and employees of each of them, each Person who controls any such Buyer (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, partners, members, agents and employees of each such controlling Person, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, costs of preparation and attorneys' fees) and expenses (collectively, "Losses"), as incurred, arising out of or relating to (A) any misrepresentation or breach of any representation or warranty made by the Company in the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, (B) any breach of any material covenant, agreement or obligation of the Company contained in the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, or (C) any untrue or alleged untrue statement of a material fact contained in the Registration Statement, any Prospectus or any form of Company prospectus or in any amendment or supplement thereto or in any Company preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or form of prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading, except to the extent, but only to the extent, that (x) such untrue statements, alleged untrue statements, omissions or alleged omissions are based solely upon information regarding such Buyer furnished in writing to the Company by such Buyer for use therein, or to the extent that such information relates to such Buyer or such Buyer's proposed method of distribution of Registrable Securities, or (y) the use by such Buyer of an outdated or defective Prospectus after the Company has notified such Buyer in writing that the Prospectus is outdated or defective and prior to the receipt by such Buyer of the Advice contemplated in <u>Section 6(f)</u>.  The Company shall notify the Buyers promptly of the institution, threat or assertion of any Proceeding of which the Company is aware in connection with the transactions contemplated by this Agreement.

(ii)    <u>Indemnification by Buyers</u>.  Each Buyer shall, severally and not jointly,

indemnify and hold harmless the Company, its directors, officers, agents and employees, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, agents or employees of such controlling Persons, to the fullest extent permitted by applicable law, from and against all Losses incurred, arising out of or relating to (A) any misrepresentation or breach of any representation or warranty made by Buyer in the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, (B) any breach of any material covenant, agreement or obligation of Buyer contained in the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, or (C) any untrue or alleged untrue statement of a material fact contained in the Registration Statement, any Prospectus or any form of Company prospectus or in any amendment or supplement thereto or in any Company preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or form of prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading, to the extent, that (x) such untrue statements, alleged untrue statements, omissions or alleged omissions are based solely upon information regarding such Buyer furnished in writing to the Company by such Buyer for use therein, or to the extent that such information relates to such Buyer or such Buyer's proposed method of distribution of Registrable Securities, or (y) the use by such Buyer of an outdated or defective Prospectus after the Company has notified such Buyer in writing that the Prospectus is outdated or defective and prior to the receipt by such Buyer of the Advice contemplated in <u>Section 6(f)</u>. In no event shall the liability of any selling Buyer hereunder be greater in amount than the dollar amount of the net proceeds received by such Buyer upon the sale of the Registrable Securities giving rise to such indemnification obligation.

(iii)    Conduct of Indemnification Proceedings. If any Proceeding shall be brought or asserted against any Person entitled to indemnity hereunder (an "**Indemnified Party**"), such Indemnified Party shall promptly notify the Person from whom indemnity is sought (the "**Indemnifying Party**") in writing, and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all fees and expenses incurred in connection with defense thereof; provided, that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that it shall be finally determined by a court of competent jurisdiction (which determination is not subject to appeal or further review) that such failure shall have proximately and materially adversely prejudiced the Indemnifying Party.

An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless: (i) the Indemnifying Party has agreed in writing to pay such fees and expenses; or (ii) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding; or (iii) the named parties to any such Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by counsel in writing  that a conflict of interest exists if the same counsel were to represent such Indemnified Party and the Indemnifying Party (in which case, if such Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense thereof and such counsel shall be at the expense of the Indemnifying Party). It being understood, however, that the Indemnifying Party shall not, in connection with any one such Proceeding be liable for the fees and

expenses of more than one separate firm of attorneys at any time for all Indemnified Parties, which firm shall be appointed by a majority of the Indemnified Parties; provided, however, that in the case a single firm of attorneys would be inappropriate due to actual or potential differing interests of conflicts between such Indemnified Parties and any other party represented by such counsel in such Proceeding or otherwise, then the Indemnifying Party shall be liable for the fees and expenses of one additional firm of attorneys with respect to such Indemnified Parties. The Indemnifying Party shall not be liable for any settlement of any such Proceeding effected without its written consent, which consent shall not be unreasonably withheld. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding.

All fees and expenses of the Indemnified Party (including reasonable fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section) shall be paid to the Indemnified Party, as incurred, within ten Trading Days of written notice thereof to the Indemnifying Party (regardless of whether it is ultimately determined that an Indemnified Party is not entitled to indemnification hereunder; provided, that the Indemnifying Party may require such Indemnified Party to undertake to reimburse all such fees and expenses to the extent it is finally judicially determined that such Indemnified Party is not entitled to indemnification hereunder).

(iv)    Contribution. If a claim for indemnification under Section 6(e)(i) or (ii) is unavailable to an Indemnified Party (by reason of public policy or otherwise), then each Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission. The amount paid or payable by a party as a result of any Losses shall be deemed to include, subject to the limitations set forth in Section 6(e)(iii), any reasonable attorneys' or other reasonable fees or expenses incurred by such party in connection with any Proceeding to the extent such party would have been indemnified for such fees or expenses if the indemnification provided for in this Section was available to such party in accordance with its terms.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 6(e)(iv) were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this Section 6(e)(iv) no Buyer shall be required to contribute, in the aggregate, any amount in excess of the amount by which the proceeds actually received by such Buyer from the sale of the Registrable Securities subject to the Proceeding exceeds the amount of any damages that such Buyer has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. The indemnity and contribution agreements contained in

this Section are in addition to any liability that the Indemnifying Parties may have to the Indemnified Parties.

(c) Dispositions. Each Buyer agrees that it will comply with the prospectus delivery requirements of the Securities Act as applicable to it in connection with sales of Registrable Securities pursuant to the Registration Statement. Each Buyer further agrees that, upon receipt of a notice from the Company of the occurrence of any event of the kind described in Sections 6(c)(ii)(B)(v), (vi) or (vii), such Buyer will discontinue disposition of such Registrable Securities under the Registration Statement until such Buyer's receipt of the copies of the supplemented Prospectus and/or amended Registration Statement contemplated by Section 6(c)(ii)(I), or until it is advised in writing (the "**Advice**") by the Company that the use of the applicable Prospectus may be resumed, and, in either case, has received copies of any additional or supplemental filings that are incorporated or deemed to be incorporated by reference in such Prospectus or Registration Statement. The Company may provide appropriate stop orders to enforce the provisions of this paragraph.

(d) No Piggyback on Registrations. Neither the Company nor any of its security holders (other than the Buyers in such capacity pursuant hereto) may include securities of the Company in the Registration Statement other than (i) the Registrable Securities, (ii) those shares of Common Stock issued in connection with acquisitions consummated prior to the date hereof and listed on Schedule 6(g) hereto, and (iii) up to 4 million shares of Common Stock issued in connection with certain targeted acquisitions to the extent such acquisitions close prior to the filing of the Registration Statement as set forth on Schedule 6(g).

(e) Piggy-Back Registrations. If at any time during the Effectiveness Period there is not an effective Registration Statement covering all of the Registrable Securities and the Company shall determine to prepare and file with the SEC a registration statement relating to an offering for its own account or the account of others under the Securities Act of any of its equity securities, other than on Form S-4 or Form S-8 (each as promulgated under the Securities Act) or their then equivalents relating to equity securities to be issued solely in connection with any acquisition of any entity or business or equity securities issuable in connection with stock option or other employee benefit plans, then the Company shall send to each Buyer written notice of such determination and if, within ten days after receipt of such notice, any such Buyer shall so request in writing, the Company shall include in such registration statement all or any part of such Registrable Securities such Buyer requests to be registered.

1. SEC COMMENT LETTER. The Buyers hereby acknowledge that they have reviewed the disclosure regarding the Company's receipt of a Comment Letter from the United States Securities and Exchange Commission (the "Comment Letter") as set forth in the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2005 (the "Report"). The Buyers acknowledge that the Company remains in communication with the SEC in an effort to resolve the matters set forth in the Comment Letter, and that the Company is unable at this time to determine what impact, if any, the matters set forth in the Comment Letter may have on the Company's financial condition, and/or financial statements and that the Company has made no additional representations or warranties to the Buyers with regard to the Comment Letter. The Buyers hereby agree that in the event that a restatement of the Company's financial statements occurs as a result of the resolution of the Comment Letter, such restatement shall not in and of itself constitute a breach of a representation or warranty by the Company under this Agreement.

2.    TERMINATION.  In the event that the Closing shall not have occurred with respect to a Buyer on or before five (5) days from the date hereof due to the Company's or such Buyer's failure to satisfy the conditions set forth in Section 1(d) above (and the nonbreaching party's failure to waive such unsatisfied condition(s)), the nonbreaching party shall have the option to terminate this Agreement with respect to such breaching party at the close of business on such date without liability of any party to any other party.

3.    MISCELLANEOUS.

(a) Governing Law; Jurisdiction; Jury Trial.  All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York.  Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper.  Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

(b) Counterparts.  This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party; provided that a facsimile signature shall be considered due execution and shall be binding upon the signatory thereto with the same force and effect as if the signature were an original, not a facsimile signature.

(c) Headings.  The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

(d) Severability.  If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction.

(e) Entire Agreement; Amendments.  No provision of this Agreement may be waived or amended except in a written instrument signed, in the case of an amendment, by the Company and each of the Buyers or, in the case of a waiver, by the party against whom enforcement of any such waiver is sought.  No waiver of any default with respect to any provision, condition or requirement of this

Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of either party to exercise any right hereunder in any manner impair the exercise of any such right. The Company has not, directly or indirectly, made any agreements with any Buyers relating to the terms or conditions of the transactions contemplated by the Transaction Documents except as set forth in the Transaction Documents.

(f) Notices. Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (iii) one Business Day after deposit with an overnight courier service, in each case properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

If to the Company:

PainCare Holdings, Inc.
1030 N. Orange Avenue, Suite 105
Orlando, Florida
Telephone: 407-367-0944
Facsimile: 407-367-0950
Attention: Mark Szporka

With a copy to:

Adorno & Yoss LLP
350 East Las Olas Boulevard, Suite 1700
Fort Lauderdale, Florida 33301
Telephone: 954-763-1200
Facsimile: 954-766-7800
Attention: Joel D. Mayersohn

If to a Buyer, to its address and facsimile number set forth on the Schedule of Buyers, with copies to such Buyer's representatives as set forth on the Schedule of Buyers,

or to such other address and/or facsimile number and/or to the attention of such other Person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change. Written confirmation of receipt (A) given by the recipient of such notice, consent, waiver or other communication, (B) mechanically or electronically generated by the sender's facsimile machine containing the time, date, recipient facsimile number and an image of the first page of such transmission or (C) provided by an overnight courier service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from an overnight courier service in accordance with clause (i), (ii) or (iii) above, respectively.

(g) Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. The Buyer may, with prior written notice to the Company, assign its registration rights under Sections 6(a), (b), (c), (d), (f), (g), and (h)_of this Agreement to transferees of the Common Shares, the Warrants, and the Warrant Shares, but may not

assign any other rights under this Agreement or obligations hereunder without the prior written consent of the Company, which consent shall not be unreasonably withheld.

(h) No Third Party Beneficiaries. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other Person.

(i) Survival. Unless this Agreement is terminated under Section 8, the representations, warranties and covenants of the Company and the Buyers contained herein shall survive the Closing for a period of two (2) years. Each Buyer shall be responsible only for its own representations, warranties, agreements and covenants hereunder.

(j) Further Assurances. Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as any other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

(k) No Strict Construction. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

(l) Remedies. Each Buyer and each holder of the Securities shall have all rights and remedies set forth in the Transaction Documents and all rights and remedies which such holders have been granted at any time under any other agreement or contract and all of the rights which such holders have under any law. Any Person having any rights under any provision of this Agreement shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law. Furthermore, the Company recognizes that in the event that it fails to perform, observe, or discharge any or all of its obligations under the Transaction Documents, any remedy at law may prove to be inadequate relief to the Buyers. The Company therefore agrees that the Buyers shall be entitled to seek temporary and permanent injunctive relief in any such case without the necessity of proving actual damages and without posting a bond or other security.

(m) Rescission and Withdrawal Right. Notwithstanding anything to the contrary contained in (and without limiting any similar provisions of) the Transaction Documents, whenever any Buyer exercises a right, election, demand or option under a Transaction Document and the Company does not timely perform its related obligations within the periods therein provided, then such Buyer may rescind or withdraw, in its sole discretion from time to time upon written notice to the Company, any relevant notice, demand or election in whole or in part without prejudice to its future actions and rights

(n) Payment Set Aside. To the extent that the Company makes a payment or payments to the Buyers hereunder or pursuant to any of the other Transaction Documents or the Buyers enforce or exercise their rights hereunder or thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to the Company, a trustee, receiver or any other Person under any law (including, without limitation, any bankruptcy law, state or federal law, common law or equitable cause of action), then to the extent of any such restoration the obligation or part thereof originally intended to be satisfied shall

be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

(o) <u>Replacement of Securities</u>. If any certificate or instrument evidencing any Securities is mutilated, lost, stolen or destroyed, the Company shall issue or cause to be issued in exchange and substitution for and upon cancellation thereof, or in lieu of and substitution therefor, a new certificate or instrument, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction and customary and reasonable indemnity, if requested.

(p) <u>Liquidated Damages</u>. The Company's obligations to pay any partial liquidated damages or other amounts owing under the Transaction Documents is a continuing obligation of the Company and shall not terminate until all unpaid partial liquidated damages and other amounts have been paid notwithstanding the fact that the instrument or security pursuant to which such partial liquidated damages or other amounts are due and payable shall have been canceled.

(q) <u>Independent Nature of Buyers' Obligations and Rights</u>. The obligations of each Buyer under any Transaction Document are several and not joint with the obligations of any other Buyer, and no Buyer shall be responsible in any way for the performance of the obligations of any other Buyer under any Transaction Document. Nothing contained herein or in any other Transaction Document, and no action taken by any Buyer pursuant hereto or thereto, shall be deemed to constitute the Buyers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Buyers are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents and the Company acknowledges that the Buyers are not acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents. Each Buyer confirms that it has independently participated in the negotiation of the transaction contemplated hereby with the advice of its own counsel and advisors. Each Buyer shall be entitled to independently protect and enforce its rights, including, without limitation, the rights arising out of this Agreement or out of any other Transaction Documents, and it shall not be necessary for any other Buyer to be joined as an additional party in any proceeding for such purpose.

**[Signature Page Follows]**

{203840.0002/N0583265_2}

1

**IN WITNESS WHEREOF,** each Buyer and the Company have caused its respective signature page to this Securities Purchase Agreement to be duly executed as of the date first written above.

**COMPANY:**
**PAINCARE HOLDINGS, INC.**


By:  /s/ Randy Lubinsky
    Name: Randy Lubinsky
    Title:  CEO


{203840.0002/N0583265_2}

1

Securities Purchase Agreement (draft from O.C.)-Final (N0583265.DOC;2)                    Page 35 of 44

**IN WITNESS WHEREOF,** each Buyer and the Company have caused their respective signature page to this Securities Purchase Agreement to be duly executed as of the date first written above.

**BUYER:**


By:
    Name:                                        Title:


{203840.0002/N0583265_2}

2

# SCHEDULE OF BUYERS

| Entity | Shares | Purchase Price | Amount | Warrants |
|---|---|---|---|---|
| Shepherd Investments International, Ltd. By: Stark Offshore Management, LLC | 750,000 | $3.10 | $2,325,000.00 | 306,325 |
| Capital Ventures International By: Heights Capital Management, Inc. | 322,581 | $3.10 | $1,000,001.10 | 131,753 |
| Crown Investment Partners, LP | 160,000 | $3.10 | $  496,000.00 | 65,350 |
| The Crown Advisors #3 | 33,000 | $3.10 | $  102,300.00 | 13,478 |
| The Crown Advisors #5 | 33,000 | $3.10 | $  102,300.00 | 13,478 |
| Midsummer Investment, Ltd. | 806,452 | $3.10 | $2,500,001.20 | 329,381 |
| Lagunitas Partners, LP | 700,000 | $3.10 | $2,170,000.00 | 285,903 |
| Gruber & McBaine International | 260,000 | $3.10 | $  806,000.00 | 106,192 |
| Jon D and Linda W Gruber Trust | 120,000 | $3.10 | $  372,000.00 | 49,012 |
| J Patterson McBaine | 120,000 | $3.10 | $  372,000.00 | 49,012 |

{203840.0002/N0583265_2}

1

Securities Purchase Agreement (draft from O.C.)-Final (N0583265.DOC;2)    Page 37 of 44

## **EXHIBITS**

Exhibit A    Form of Warrant
Exhibit B    Company Counsel Opinion
Exhibit C    Transfer Agent Instructions
Exhibit D    Plan of Distribution

{203840.0002/N0583265_2}

Securities Purchase Agreement (draft from C.C.)-Final (N0583265.DOC;2)    Page 38 of 44

# EXHIBIT A

# FORM OF WARRANT

{203840.0002/N0583265_2}

## EXHIBIT B

## FORM OF LEGAL OPINION

Subject to the foregoing, it is our opinion that, as of the date hereof:

1. The Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Florida and is duly qualified as a foreign corporation in each state where it is required to so qualify, except where the failure to so qualify would not have a Material Adverse Effect on the Company, and has the requisite corporate power to own its properties and to carry on its business as now being conducted.

2. Assuming and relying upon the truth and accuracy of the representations and warranties contained in the Agreement by all the parties thereto, (i) the Company has the requisite corporate power and authority to enter into and perform its obligations under the Transaction Documents and to issue the Common Shares, the Warrants and the Warrant Shares, in accordance with the terms of the Agreement; (ii) the execution, delivery and performance of the Transaction Documents by the Company and the consummation by it of the transactions contemplated thereby, have been duly authorized by the Company's Board of Directors, and no further consent or authorization of the Company or its Board of Directors or stockholders is required; and (iii) the Transaction Documents constitute legal, valid and binding obligations of the Company enforceable against the Company in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting the enforcement of creditors' rights.

3. The Common Shares and the Warrants have been duly authorized and, upon issuance in accordance with the Agreement and receipt by the Company of the full consideration therefor, the Common Shares will be validly issued, fully paid and nonassessable. The Warrant Shares, upon issuance in accordance with the Warrants, including the Company's receipt of the full consideration therefor, will be validly issued, fully paid and nonassessable. The Common Shares and the Warrant Shares are not subject to any preemptive rights contained in the Certificate of Incorporation or Bylaws of the Company. To Counsel's knowledge, the Company has duly and validly reserved for issuance a sufficient number of shares of Common Stock to effect the issuance of the Warrant Shares pursuant to the Transaction Documents.

4. The execution, delivery and performance of the Transaction Documents by the Company and the consummation by the Company of the transactions contemplated by the Transaction Documents, including without limitation the issuance of the Common Shares, the Warrants and the Warrant Shares in accordance with the terms of the Agreement and the Certificate of Incorporation (as amended to date), do not and will not result in a violation of the Certificate of Incorporation (as amended to date), or Bylaws, or to our knowledge, conflict with, or constitute a default under any Material Agreement.

5. The execution, delivery and performance of the Transaction Documents by the Company and the consummation by the Company of the transactions contemplated by the Transaction Documents, (i) do not and will not result in a violation of any federal or Florida law, rule or regulation applicable to the Company, or, to our knowledge, any order,

judgment or decree by which any property or asset of the Company is bound, and (ii) will not require the Company to obtain any approval, consent, authorization, waiver, exemption or order of, or make any filing or registration with, any federal or Florida court or governmental or regulatory agency having jurisdiction over the Company in order for it to execute, deliver or perform any of its obligations under the Transaction Documents or to issue and deliver the Common Shares, the Warrants and the Warrant Shares in accordance with the terms of the Transaction Documents (other than any filings with the Securities and Exchange Commission or under state securities laws that may be required to be made by the Company subsequent to the Closing).

6. Based upon the representations and warranties of the Buyers and the Company, the offer, issuance, sale and delivery of the Common Stock, Warrants and Warrant Shares to the Buyer in accordance with the terms of the Transaction Documents constitute a transaction exempt from registration under Section 5 of the Securities Act of 1933, as amended, pursuant to Regulation D promulgated thereunder.

7. To our knowledge, there is no action, suit, claim, investigation or proceeding pending or threatened against the Company or the Subsidiary which questions the validity of the Agreement or the transactions contemplated thereby or any action taken or to be taken pursuant thereto. To our knowledge, there are no outstanding orders, judgments, injunctions, awards or decrees of any court, arbitrator or governmental or regulatory body against the Company or the Subsidiary or any officers or directors of the Company or the Subsidiary in their capacities as such.

{203840.0002/N0583265_2}

Securities Purchase Agreement (draft from O.C.)-Final (N0583263.DOC;2)
Case 1:07-cv-09836-SAS     Document 1-3     Filed 11/06/2007     Page 20 of 23
Page 41 of 44

## EXHIBIT C

## COMPANY TRANSFER AGENT INSTRUCTIONS

American Stock Transfer and Trust Company
59 Maiden Lane
New York, NY 10038

Attention: _____

Ladies and Gentlemen:

Reference is made to that certain Securities Purchase Agreement, dated as of December ___, 2005 (the "**Agreement**"), by and PainCare Holdings Inc., a Florida corporation (the "**Company**"), and the investors named on the Schedule of Buyers attached thereto (collectively, the "**Holders**"), pursuant to which the Company is issuing to the Holders shares (the "**Common Shares**") of Common Stock of the Company, par value $.0001 per share (the "**Common Stock**"), and Warrants (the "**Warrants**"), which are exercisable into shares of Common Stock.

This letter shall serve as our irrevocable authorization and direction to you (provided that you are the transfer agent of the Company at such time):

(i)     to issue shares of Common Stock upon transfer or resale of the Common Shares; and

(ii)     to issue shares of Common Stock upon the exercise of the Warrants (the "**Warrant Shares**") to or upon the order of a Holder from time to time upon delivery to you of a properly completed and duly executed Exercise Notice, in the form attached hereto as Exhibit I, which has been acknowledged by the Company as indicated by the signature of a duly authorized officer of the Company thereon.

You acknowledge and agree that so long as you have previously received (a) written confirmation from the Company's legal counsel that either (i) a registration statement covering resales of the Common Shares and the Warrant Shares has been declared effective by the Securities and Exchange Commission (the "**SEC**") under the Securities Act of 1933, as amended (the "**1933 Act**"), or (ii) sales of the Common Shares and the Warrant Shares may be made in conformity with Rule 144 under the 1933 Act ("**Rule 144**"), (b) if applicable, a copy of such registration statement, and (c) notice from legal counsel to the Company that a transfer of Common Shares and/or Warrant Shares has been effected either pursuant to the registration statement (and a prospectus delivered to the transferee) or pursuant to Rule 144, then, unless otherwise required by law, within three (3) business days of your receipt of the notice referred to in (c), you shall issue the certificates representing the Common Shares and the Warrant Shares so sold to the transferees registered in the names of such transferees, and such certificates shall not bear any legend restricting transfer of the Common Shares and the Warrant Shares thereby and should not be subject to any stop-transfer restriction.

A form of written confirmation (to be used in connection with any sale) from the Company's outside legal counsel that a registration statement covering resales of the Common Shares and the Warrant Shares has been declared effective by the SEC under the 1933 Act is attached hereto as

Exhibit II.

Please be advised that the Holders are relying upon this letter as an inducement to enter into the Agreement and, accordingly, each Holder is a third party beneficiary to these instructions.

Please execute this letter in the space indicated to acknowledge your agreement to act in accordance with these instructions. Should you have any questions concerning this matter, please contact me at _____.

<div style="margin-left: 40%">

Very truly yours,

**PAINCARE HOLDINGS INC.**

By: _
    Name:
    Title:

</div>

THE FOREGOING INSTRUCTIONS ARE
ACKNOWLEDGED AND AGREED TO
this    day of _____, 2005

**AMERICAN STOCK TRANSFER AND
TRUST COMPANY**

By:
    Name:
    Title:

Enclosures

{203840.0002/N0583265_2}

## EXHIBIT D

## PLAN OF DISTRIBUTION

Each Selling Stockholder (the "Selling Stockholders") of the common stock ("Common Stock") of PainCare Holdings Inc., a Florida corporation (the "Company") and any of their pledgees, assignees and successors-in-interest may, from time to time, sell any or all of their shares of Common Stock on the Trading Market or any other stock exchange, market or trading facility on which the shares are traded or in private transactions. These sales may be at fixed or negotiated prices. A Selling Stockholder may use any one or more of the following methods when selling shares:

- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

- block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- settlement of short sales entered into after the effective date of the registration statement of which this prospectus is a part;

- broker-dealers may agree with the Selling Stockholders to sell a specified number of such shares at a stipulated price per share;

- a combination of any such methods of sale;

- through the writing or settlement of options or other hedging transactions, whether through an options exchange or otherwise; or

- any other method permitted pursuant to applicable law.

The Selling Stockholders may also sell shares under Rule 144 under the Securities Act of 1933, as amended (the "Securities Act"), if available, rather than under this prospectus.

Broker-dealers engaged by the Selling Stockholders may arrange for other brokers-dealers to participate in sales. Broker-dealers may receive commissions or discounts from the Selling Stockholders (or, if any broker-dealer acts as agent for the purchaser of shares, from the purchaser) in amounts to be negotiated, but, except as set forth in a supplement to this Prospectus, in the case of an agency transaction not in excess of a customary brokerage commission in compliance with NASDR Rule 2440; and in the case of a principal transaction a markup or markdown in compliance with NASDR IM-2440.

In connection with the sale of the Common Stock or interests therein, the Selling Stockholders may enter into hedging transactions with broker-dealers or other financial institutions, which may in turn engage in short sales of the Common Stock in the course of hedging the positions they assume. The

Selling Stockholders may also sell shares of the Common Stock short and deliver these securities to close out their short positions, or loan or pledge the Common Stock to broker-dealers that in turn may sell these securities. The Selling Stockholders may also enter into option or other transactions with broker-dealers or other financial institutions or the creation of one or more derivative securities which require the delivery to such broker-dealer or other financial institution of shares offered by this prospectus, which shares such broker-dealer or other financial institution may resell pursuant to this prospectus (as supplemented or amended to reflect such transaction).

The Selling Stockholders and any broker dealers or agents that are involved in selling the shares may be deemed to be "underwriters" within the meaning of the Securities Act in connection with such sales. In such event, any commissions received by such broker dealers or agents and any profit on the resale of the shares purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act. Each Selling Stockholder has informed the Company that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock.

The Company is required to pay certain fees and expenses incurred by the Company incident to the registration of the shares. The Company has agreed to indemnify the Selling Stockholders against certain losses, claims, damages and liabilities, including liabilities under the Securities Act.

Because Selling Stockholders may be deemed to be "underwriters" within the meaning of the Securities Act, they will be subject to the prospectus delivery requirements of the Securities Act. In addition, any securities covered by this prospectus which qualify for sale pursuant to Rule 144 under the Securities Act may be sold under Rule 144 rather than under this prospectus. Each Selling Stockholder has advised us that they have not entered into any written or oral agreements, understandings or arrangements with any underwriter or broker-dealer regarding the sale of the resale shares. There is no underwriter or coordinating broker acting in connection with the proposed sale of the resale shares by the Selling Stockholders.

We agreed to keep this prospectus effective until the earlier of (i) the date on which the shares may be resold by the Selling Stockholders without registration and without regard to any volume limitations by reason of Rule 144(e) under the Securities Act or any other rule of similar effect or (ii) all of the shares have been sold pursuant to the prospectus or Rule 144 under the Securities Act or any other rule of similar effect. The resale shares will be sold only through registered or licensed brokers or dealers if required under applicable state securities laws. In addition, in certain states, the resale shares may not be sold unless they have been registered or qualified for sale in the applicable state or an exemption from the registration or qualification requirement is available and is complied with.

{203840.0002/N0583265_2}