Securities Purchase Agreement (draft from O.C.)-Final  (N0583265.DOC;2)          Page 16 of 44

Company pursuant to this Agreement or any other Transaction Document, including, without limitation, Section 2(f) of this Agreement; provided that a Buyer and its pledgee shall be required to comply with the provisions of Section 2(f) of this Agreement in order to effect a sale, transfer or assignment of Securities to such pledgee. The Company hereby agrees to execute and deliver such documentation as a pledgee of the Securities may reasonably request in connection with a pledge of the Securities to such pledgee by a Buyer.

(i) <u>Disclosure of Transactions and Other Material Information</u>. The Company shall, on or before 8:30 a.m., New York City Time, on the first Business Day after the date of this Agreement, issue a press release (the "**Press Release**") reasonably acceptable to the Buyers disclosing all material terms of the transactions contemplated hereby. On or before 8:30 a.m., New York City Time, on the fourth Business Day following the Closing Date, the Company shall file a Current Report on Form 8-K describing the terms of the transactions contemplated by the Transaction Documents in the form required by the 1934 Act, and attaching the material Transaction Documents (including, without limitation, this Agreement (and all schedules to this Agreement) as exhibits to such filing (including all attachments, the "**8-K Filing**"). From and after the issuance of the Press Release, no Buyer shall be in possession of any material, nonpublic information received from the Company, any of its Subsidiaries or any of its respective officers, directors, employees or agents, that is not disclosed in the Press Release. The Company shall not, and shall cause each of its Subsidiaries and each of their respective officers, directors, employees and agents, not to, provide any Buyer with any material, nonpublic information regarding the Company or any of its Subsidiaries from and after the filing of the Press Release without the express written consent of such Buyer. In the event of a breach of the foregoing covenant by the Company, any Subsidiary, or its each of respective officers, directors, employees and agents, in addition to any other remedy provided herein or in the Transaction Documents, a Buyer shall have the right to make a public disclosure, in the form of a press release, public advertisement or otherwise, of such material, nonpublic information without the prior approval by the Company, its Subsidiaries, or any of its or their respective officers, directors, employees or agents. Subject to the foregoing, neither the Company nor any Buyer shall issue any press releases or any other public statements with respect to the transactions contemplated hereby; <u>provided</u>, <u>however</u>, that the Company shall be entitled, without the prior approval of any Buyer, to make any press release or other public disclosure with respect to such transactions (i) in substantial conformity with the 8-K Filing and contemporaneously therewith and (ii) as is required by applicable law and regulations, including the applicable rules and regulations of the Principal Market (provided that in the case of clause (i) each Buyer shall be consulted by the Company in connection with any such press release or other public disclosure prior to its release).

(j) <u>Additional Registration Statements</u>. Until the date that is sixty (60) days following the Effective Date, the Company will not file a registration statement under the 1933 Act relating to securities that are not the Securities, other than securities on Form S-4 or Form S-8.

(k) <u>Corporate Existence</u>. So long as any Buyer beneficially owns any Warrants, the Company shall maintain its corporate existence and shall not sell all or substantially all of the Company's assets, except in the event of a merger or consolidation or sale of all or substantially all of the Company's assets, where the surviving or successor entity in such transaction assumes the Company's obligations hereunder and under the agreements and instruments entered into in connection herewith.

(l) <u>Reservation of Shares</u>. The Company shall take all action necessary to at all times have authorized, and reserved for the purpose of issuance, from and after the Closing Date, the number

Securities Purchase Agreement (draft from O.C.)-Final (N0583265.DOC;2)          Page 17 of 44

of shares of Common Stock issuable upon exercise of the Warrants being issued at the Closing in conformity with Section 3(c).

(m) Variable Rate Transactions. From the date hereof until the second anniversary of the date hereof, the Company shall be prohibited, except in connection with financing or equity arrangements entered into directly with sellers (and not third party financing sources) in connection with an acquisition, in the ordinary course of business and consistent with past practices, from effecting or entering into an agreement to effect any "Variable Rate Transaction". The term "**Variable Rate Transaction**" shall mean a transaction in which the Company issues or sells (i) any debt or equity securities that are convertible into, exchangeable or exercisable for, or include the right to receive additional shares of Common Stock either (A) at a conversion, exercise or exchange rate or other price that is based upon and/or varies with the trading prices of or quotations for the shares of Common Stock at any time after the initial issuance of such debt or equity securities, or (B) with a conversion, exercise or exchange price that is subject to being reset at some future date after the initial issuance of such debt or equity security or upon the occurrence of specified or contingent events directly or indirectly related to the business of the Company or the market for the Common Stock or (ii) enters into any agreement, including, but not limited to, an equity line of credit, whereby the Company may sell securities at a future determined price. Any Purchaser shall be entitled to obtain injunctive relief against the Company to preclude any such issuance, which remedy shall be in addition to any right to collect damages.

2.  TRANSFER RESTRICTIONS; REMOVAL OF LEGEND.

(a) Transfer Restrictions. The legend set forth in Section 2(g) shall be removed and the Company shall issue a certificate without such legend or any other legend to the holder of the applicable Securities upon which it is stamped, if (i) such Securities are registered for resale under the 1933 Act, (ii) in connection with a sale, assignment or other transfer, such holder provides the Company with an opinion of counsel, in a generally acceptable form, to the effect that such sale, assignment or transfer of such Securities may be made without registration under the applicable requirements of the 1933 Act, or (iii) such holder provides the Company with reasonable assurance that such Securities can be sold, assigned or transferred pursuant to Rule 144. The Company shall cause its counsel to issue a legal opinion to the Company's transfer agent promptly after the Effective Date if required by the Company's transfer agent to effect the removal of the legend hereunder. If all or any portion of the Warrant is exercised at a time when there is an effective registration statement to cover the resale of the Warrant Shares, such Warrant Shares shall be issued free of the legend set forth in Section 2(g). Following the Effective Date or at such earlier time as a legend is no longer required for certain Securities, the Company will no later than three Business Days following the delivery by a Buyer to the Company or the Company's transfer agent of a legended certificate representing such Securities, deliver or cause to be delivered to such Buyer a certificate representing such Securities that is free from all restrictive and other legends. Following the Effective Date and upon the delivery to any Buyer of any certificate representing Securities that is free from all restrictive and other legends, such Buyer agrees that any sale of such Securities shall be made pursuant to the Registration Statement and in accordance with the plan of distribution described therein or pursuant to an available exemption from the registration requirements of the 1933 Act. The Company may not make any notation on its records or give instructions to any transfer agent of the Company that enlarge the restrictions on transfer set forth in Section 2(g). Certificates for Securities subject to legend removal hereunder shall be transmitted by the transfer agent of the Company to the Purchasers by crediting the account of the Buyer's prime broker with the Depository Trust Company System. The Company shall bear all costs and expenses of the Transfer Agent in connection with the delivery of the certificates, whether by electronic transfer or

Securities Purchase Agreement (draft from O.C.)-Final (N0583265.DOC;2)                Page 18 of 44

otherwise, and the removal of any restrictive legends required hereby.

(b) Breach. The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to a Buyer. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Section 5 will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section 5, that a Buyer shall be entitled, in addition to all other available remedies, to an order and/or injunction restraining any breach and requiring immediate issuance and transfer, without the necessity of showing economic loss and without any bond or other security being required.

(c) Transfer Agent Instructions. The Company shall issue irrevocable instructions to its transfer agent, and any subsequent transfer agent, to issue certificates or credit shares to the applicable balance accounts at The Depository Trust Company ("**DTC**"), registered in the name of each Buyer or its respective nominee(s), for the Warrant Shares in such amounts as specified from time to time by each Buyer to the Company upon exercise of the Warrants in the form of Exhibit C attached hereto (the "**Transfer Agent Instructions**"). The Company represents and warrants that no instruction other than the Transfer Agent Instructions referred to in this Section 5, and stop transfer instructions to give effect to Section 2(f) hereof, will be given by the Company to its transfer agent with respect to the Securities, except as otherwise required by law, and that the Securities shall otherwise be freely transferable on the books and records of the Company as and to the extent provided in this Agreement and the other Transaction Documents.

(d) Additional Relief. If the Company shall fail for any reason or for no reason, other than solely as a result of the actions or inactions of any Buyer, to issue to such holder unlegended certificates within five (5) Business Days of receipt of documents necessary for the removal of legend set forth above (the "**Deadline Date**"), then, in addition to all other remedies available to the holder, if on or after the Trading Day (as defined below) immediately following such five Business Day period, the holder purchases (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by the holder of shares of Common Stock that the holder anticipated receiving from the Company (a "**Buy-In**"), then the Company shall, within five Business Days after the holder's request and in the holder's discretion, either (i) pay cash to the holder in an amount equal to the holder's total purchase price (including brokerage commissions, if any) for the shares of Common Stock so purchased (the "**Buy-In Price**"), at which point the Company's obligation to deliver such certificate (and to issue such shares of Common Stock) shall terminate, or (ii) promptly honor its obligation to deliver to the holder a certificate or certificates representing such shares of Common Stock and pay cash to the holder in an amount equal to the excess (if any) of the Buy-In Price over the product of (A) such number of shares of Common Stock, times (B) the Closing Bid Price on the Deadline Date. "**Closing Bid Price**" means, for any security as of any date, the last closing price for such security on the Principal Market), as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing bid price then the last bid price of such security prior to 4:00:00 p.m., New York Time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last closing price of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg, or if the foregoing do not apply, the last closing price of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no closing bid price is reported for such security by Bloomberg, the average of the bid prices of any market makers for such security as reported in the "pink sheets" by Pink Sheets LLC (formerly the National Quotation Bureau, Inc.). If the Closing Bid Price cannot be calculated for a security on a particular date

Securities Purchase Agreement (draft from O.C.)-Final  (N0583265.DOC;2)           Page 19 of 44

on any of the foregoing bases, the Closing Bid Price of such security on such date shall be the fair market value as mutually determined by the Company and the holder. All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during the applicable calculation period.

3. REGISTRATION RIGHTS

(a) Defined Terms. As used in this Section 6, the following terms shall have the following meanings:

(i) "**Business Day**" means any day other than Saturday, Sunday or any other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

(ii) "**Effective Date**" means the date that the Registration Statement is first declared effective by the SEC.

(iii) "**register**," "**registered**," and "**registration**" refer to a registration effected by preparing and filing one or more Registration Statements (as defined below) in compliance with the 1933 Act and pursuant to Rule 415, and the declaration or ordering of effectiveness of such Registration Statement(s) by the SEC.

(iv) "**Registrable Securities**" means (i) the Common Shares, (ii) the Warrant Shares issued or issuable upon exercise of the Warrant and (iii) any shares of capital stock issued or issuable with respect to the Common Shares or the Warrant Shares as a result of any stock split, stock dividend, recapitalization, exchange or similar event or otherwise, without regard to any limitations on exercise of the Warrant.

(v) "**Registration Statement**" means a registration statement or registration statements of the Company filed under the 1933 Act covering the Registrable Securities.

(vi) "**Rule 415**" means Rule 415 under the 1933 Act or any successor rule providing for offering securities on a continuous or delayed basis.

(vii) "**SEC**" means the United States Securities and Exchange Commission.

(viii) "**Trading Day**" means (a) any day on which the Common Stock is listed or quoted and traded on its Primary Market, (b) if the Common Stock is not then listed or quoted and traded on any Eligible Market, then a day on which trading occurs on the NASDAQ National Market (or any successor thereto), or (c) if trading ceases to occur on the NASDAQ National Market (or any successor thereto), any Business Day.

(b) Shelf Registration.

(i) As promptly as possible, and in any event on or prior to the thirtieth (30th) day following the Closing Date (the "**Filing Date**"), the Company shall prepare and file with the SEC a "Shelf" Registration Statement covering the resale of all Registrable Securities for an offering to be made on a continuous basis pursuant to Rule 415. The Registration Statement shall be on Form S-3 (except if the Company is not then eligible to register for resale the Registrable Securities on Form S-3,

Securities Purchase Agreement (draft from O.C.)-Final (N0583265.DOC;2)    Page 20 of 44

in which case such registration shall be on another appropriate form in accordance with the Securities Act and the Exchange Act and as consented to by the Buyers) and shall contain (except if otherwise directed by the Buyers or the SEC) the "Plan of Distribution" attached hereto as Exhibit D.

(ii) The Company shall use its reasonable best efforts to cause the Registration Statement to be declared effective by the SEC as promptly as possible after the filing thereof, but in any event prior to (A) the 90th calendar day following the Closing Date, (B) the 120th calendar day following the Closing Date in the case of any review by the SEC or (C) the 5th calendar following oral or written notification from the SEC that there will be no review (the "**Required Effectiveness Date**"), and shall use its reasonable best efforts to keep the Registration Statement continuously effective under the Securities Act until the earlier of the date that all Registrable Securities covered by such Registration Statement have been sold or can be sold publicly under Rule 144(k) (the "**Effectiveness Period**").

(iii) The Company shall notify the Buyers in writing promptly (and in any event within two business days) after receiving notification from the SEC that the Registration Statement has been declared effective.

(iv) Should an Event (as defined below) occur, then upon the occurrence of such Event, and on every monthly anniversary thereof until the applicable Event is cured, as partial relief for the damages suffered therefrom by the Buyers (which remedy shall not be exclusive of any other remedies available under this Agreement, at law or in equity), the Company shall pay to each Buyer an amount in cash, as liquidated damages and not as a penalty, equal to 1.0% (the "**Percentage**") of the aggregate Purchase Price paid or payable by such Buyer for the Securities; provided that if the Event shall continue for three (3) months, beginning with the fourth month, the Percentage shall be increased to 2%. The payments to which a Buyer shall be entitled pursuant to this Section 6(b)(iv) are referred to herein as "**Event Payments**". In the event the Company fails to make Event Payments in a timely manner, such Event Payments shall bear interest at the rate of 1.0% per month until paid in full. For such purposes, each of the following shall constitute an "**Event**":

(1) the Registration Statement is not filed on or prior to the Filing Date or is not declared effective on or prior to the Required Effectiveness Date, except as a result of any action or inaction of Buyers;

(2) except (A) as provided for in Section 6(b)(v), (B) if the Company is involved in a "Rule 13e-3 transaction" as defined in Rule 13e-3 under the Exchange Act, or (C) a merger or consolidation of the Company or a sale of more than one-half of the assets of the Company in one or a series of related transactions, unless following such transaction or series of transactions, the holders of the Company's securities prior to the first such transaction continue to hold at least 50% of the voting rights and equity interests of the surviving entity or acquirer (clauses (B) and (C), collectively, the "**Excluded Events**"), after the Effective Date, a Buyer is not permitted to sell Registrable Securities under the Registration Statement (or a subsequent Registration Statement filed in replacement thereof) for any reason (other than the fault of such Buyer) for five or more Trading Days (whether or not consecutive);

(3) except as a result of the Excluded Events, the Common Stock is not listed or quoted, or is suspended from trading, on an Eligible Market for a period of three Trading Days (which need not be consecutive Trading Days) during the Effectiveness Period;